EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Enrique Rodríguez Méndez, et als<br><br>Recurrido<br><br>v.<br><br>Laser Eye Surgery Management of Puerto Rico, Inc., et al.<br><br>Peticionaria | 2016 TSPR 121<br><br>195 DPR ____ |

Número del Caso: CC-2015-175

Fecha: 15 de junio de 2016

Tribunal de Apelaciones:

Región Judicial de Bayamón y Utuado, Panel VI

Abogados de la parte Peticionaria:

Lcdo. Rafael E. Aguiló Vélez
Lcda. Erika Berríos Berríos

Abogado del Recurrido:

Lcdo. Carlos Colón Marchand

Materia: Daños y Perjuicios, Moción de Sentencia Sumaria: La falta de mantenimiento o limpieza que convierte un producto, posterior a su venta, en uno nocivo, puede conllevar la imposición de responsabilidad estricta por productos defectuosos bajo la modalidad de advertencias inadecuadas. Sin embargo, procede la Moción de Sentencia Sumaria que presentó la parte peticionaria por la insuficiencia de la prueba de la parte recurrida.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Enrique Rodríguez Méndez, et als

      Recurrido

        v.                        CC-2015-0175

Laser Eye Surgery Management of Puerto Rico, Inc., et al.

      Peticionaria

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 15 de junio de 2016.

Este caso nos permite considerar la siguiente controversia: si la falta de mantenimiento o limpieza que convierte un producto, posterior a su venta, en uno nocivo, hace que responda un fabricante bajo la doctrina de responsabilidad estricta por productos defectuosos. Así, nos corresponde determinar si, como cuestión de derecho, procede una moción de sentencia sumaria ante prueba insuficiente para establecer una causa de acción por un alegado producto defectuoso, luego de haber concluido un descubrimiento de prueba adecuado.

I.

El 17 de agosto de 2004, el Sr. Enrique Rodríguez Méndez y su esposa, la Sra. Leidy Y. Vargas Toro (denominados conjuntamente, los recurridos) presentaron una demanda sobre daños y perjuicios en contra de Laser Eye Surgery Management of Puerto Rico, Inc. d/b/a Infinity Laser Centers (Infinity), el Dr. Manuel Del Toro, su esposa y la Sociedad Legal de Gananciales compuesta por ambos (denominados conjuntamente, demandados). En esencia, alegaron que el 20 de septiembre de 2002, el señor Rodríguez Méndez se sometió a un procedimiento quirúrgico mediante láser para corregir su visión. Este fue realizado por el doctor Del Toro en las instalaciones de Infinity.[1] No obstante, señalaron que el señor Rodríguez Méndez desarrolló la condición de Diffuse Lamellar Keratitis (DLK) por partículas microscópicas de metal que quedaron en sus ojos a raíz de la impericia médica del doctor Del Toro durante el procedimiento correctivo. Apéndice, pág. 766. Los demandados contestaron la demanda y negaron responsabilidad.

Posteriormente, los recurridos presentaron una demanda enmendada. En esta, incluyeron a Advanced Medical Optics, Inc. (AMO) como codemandado y le reclamaron resarcimiento

---

[1] Esta operación conocida como *Laser-Assisted in Situ Keratomileusis* (LASIK) es un procedimiento quirúrgico correctivo de la visión que consiste de dos etapas. Primero, se crea un colgajo —incisión en la córnea— con un instrumento de nombre *Microkeratomo* y, luego, se realiza la corrección visual con el dispositivo láser. Apéndice, pág. 295.

por los daños bajo la doctrina de responsabilidad estricta por productos defectuosos. En síntesis, arguyeron que el equipo médico utilizado en la cirugía que AMO vendió a Infinity estaba defectuoso. Oportunamente, AMO presentó su contestación a la demanda y entre sus defensas afirmativas enunció que la reclamación presentada en su contra estaba prescrita[2] y que era improcedente como cuestión de derecho. Apéndice, pág. 128.

El Tribunal de Primera Instancia permitió la referida demanda enmendada al amparo de la Regla 13 de Procedimiento Civil, 32 LPRA Ap. V. R. 13. Por consiguiente, este caso quedó configurado con dos causas de acción: una sobre impericia médica vinculada con el procedimiento correctivo de la visión y otra por alegados defectos en el equipo utilizado en ese procedimiento. Este recurso trata sobre la segunda causa de acción.

Luego de varios trámites procesales, AMO presentó una moción de sentencia sumaria mediante la cual solicitó la desestimación de la reclamación en su contra. En resumen, sostuvo que tras el descubrimiento de prueba que se extendió por un periodo de diez años, el señor Rodríguez Méndez no contaba con evidencia para sustentar sus alegaciones respecto a la causa de acción bajo la teoría de

---

[2] Surge del expediente que el asunto sobre la prescripción de la reclamación en contra de AMO fue atendido por el Tribunal de Apelaciones mediante resolución. Véase Enrique Rodríguez Méndez v. Laser Eye Surgery Management of P.R., Inc., KLCE09-01679. Destacamos que AMO no ha hecho planteamiento alguno sobre esa determinación.

responsabilidad estricta. También, planteó que la normativa que rige las reclamaciones sobre productos defectuosos no daba espacio para una determinación de responsabilidad por actos de un personal facultativo médico que no estaba dentro de la cadena de fabricación o distribución del producto. AMO acompañó con su moción de sentencia sumaria las transcripciones de las deposiciones tomadas al doctor Del Toro, al señor Rodríguez Méndez, a los peritos de las partes y los informes periciales, así como otros documentos pertinentes.

Basado en las declaraciones vertidas durante la deposición del Dr. Steven Teich, perito de los recurridos y especialista en retinas, AMO esgrimó que la condición DLK es una complicación de la operación LASIK que puede ocurrir aun sin la utilización del equipo. Apéndice, págs. 393-395. Además, AMO reseñó la opinión del doctor Teich quien sostuvo que aunque haya residuo de partículas de metal del *Microkeratomo* en los ojos del señor Rodríguez Méndez este no tuvo nada que ver con el desarrollo de la condición DLK y que no tenía una base razonable para sospechar que esta complicación se debió a un problema del equipo utilizado. Íd. De igual manera, AMO incluyó el informe de su perito, el Dr. José Gabriel Matos Malavé, quien sostuvo que tras más de 20 años de experiencia en el uso de equipos *Microkeratomo* nunca ha conocido de un caso donde el residuo de partículas o fragmentos metálicos causara la condición DLK. Apéndice, pág. 413.

Sobre el alegado defecto, AMO planteó, a través de las declaraciones expuestas durante la deposición del doctor Del Toro, que el equipo utilizado en la operación fue inspeccionado previo a ser operado y no se encontró ningún desperfecto. Apéndice, págs. 309-311. El galeno explicó que la inspección consiste en una verificación visual de los datos que exhibe el sistema en su pantalla, una observación microscópica de las navajas y una prueba donde se opera el equipo sin ponerlo en el paciente. Íd. Por otra parte, AMO subrayó que el señor Rodríguez Méndez afirmó durante su deposición desconocer cuál era el defecto del equipo utilizado en su operación LASIK. Apéndice, pág. 298. Específicamente, citó la siguiente porción del testimonio del señor Rodríguez Méndez:

> R. No sé cuál es el defecto específicamente. Pero si me quedan residuos metálicos en los ojos, no había nada bueno ahí.
> P. Okey. ¿O sea, usted no sabe cuál es el defecto entonces? ¿Usted presume que por el hecho (sic) le dejó, tenía un residuo metálico en el ojo, que algo tiene que estar mal?
> R. Definitivamente.
> P. ¿Eso es lo que me está diciendo?
> R. Definitivamente.
> P. Más allá de eso, ¿usted no sabe cuál era el defecto?
> R. No. Apéndice, pág. 378.

Posteriormente, los recurridos presentaron su oposición y reiteraron su postura de que como consecuencia del procedimiento quirúrgico al cual fue sometido el señor Rodríguez Méndez podían haber quedado residuos metálicos en sus ojos y que estos pudieron haberle causado la condición DLK. Para rebatir la falta de causalidad entre el residuo

de partículas de metal y la condición DLK imputada por AMO, los recurridos se limitaron a impugnar las declaraciones de su propio perito. Aseguraron que el doctor Teich no podía emitir una opinión sobre qué causó la condición DLK en el señor Rodríguez Méndez pues, a su entender, él no estaba facultado para emitir una conclusión definitiva sobre el asunto porque no conocía todos los hechos ni examinó al paciente. Apéndice, pág. 624. Al mismo tiempo, aceptaron que la condición de DLK puede surgir, con o sin el uso del equipo médico en cuestión, como una complicación de la operación LASIK. No obstante, replicaron de manera especulativa:

> Este es un hecho que si bien es correcto, no descarta la alta posibilidad o probabilidad de que el daño fuese causado por la falta de asepsia del personal o de Infinity y/o Del Toro y/o por falta de mantenimiento adecuado al equipo causado por alguno de ellos, y/o por tratarse de un equipo defectuoso que producía y soltaba partículas de metal al operarse, o una combinación de tales factores. Apéndice, pág. 629.

En lo pertinente al alegado defecto, justificaron que aunque el señor Rodríguez Méndez "no es médico, oftalmólogo, ingeniero ni experto en el equipo *Microkeratomo* como para precisar el defecto de la máquina o las navajas utilizadas en su operación" es "lo suficientemente inteligente para deducir que no es normal que se hallen partículas de metal dentro de sus ojos". Apéndice, pág. 616. Asimismo, para refutar la inspección del equipo efectuada por el doctor Del Toro expusieron las próximas preguntas retóricas: "¿Y de dónde salieron las

partículas metálicas, si no fue del equipo del *Microkeratomo* o de su navaja?", "¿Cuál fue el 'test'?", "¿Era el 'test' apropiado, cuando se ha establecido que el equipo dejó partículas metálicas en los ojos del demandante…?". Apéndice, pág. 627.

Tras evaluar los escritos presentados por las partes, el Tribunal de Primera Instancia notificó una resolución en la que declaró no ha lugar la moción de sentencia sumaria presentada por AMO. El foro primario resolvió que existían hechos materiales en controversia que no permitían que el caso fuera resuelto sumariamente. Específicamente, razonó que existía controversia en torno a: (1) si el equipo utilizado en el procedimiento quirúrgico estaba defectuoso; (2) si estaba limpio y esterilizado; y (3) si se le proveyó el mantenimiento correspondiente. Apéndice, pág. 923. Además, el Tribunal de Primera Instancia determinó que no había controversia en cuanto a que el señor Rodríguez Méndez fue sometido a una intervención quirúrgica de corrección visual que requiere la utilización de equipos especializados y que tras la operación un reporte médico destacó que el señor Rodríguez Méndez tenía varios fragmentos metálicos inertes en ambas córneas y sufría de la condición DLK. Apéndice, pág. 728. Con respecto a la condición DLK, precisó, como dato incontrovertido, que la medicina moderna la considera un efecto secundario previsible de la operación LASIK que no posee una causa única y específica. Apéndice, pág. 729.

Insatisfecho, AMO presentó un recurso de certiorari ante el Tribunal de Apelaciones. Alegó que el foro primario abusó de su discreción al denegar la moción de sentencia sumaria cuando no había hechos esenciales en controversia que impidieran la resolución del pleito en su contra. En esa misma fecha, el doctor Del Toro presentó un recurso de certiorari ante el foro apelativo intermedio y ambos fueron consolidados oportunamente. Apéndice, pág. 736.

El foro apelativo intermedio notificó una resolución mediante la cual denegó la expedición del auto. En cuanto al argumento de AMO sobre la falta de evidencia del señor Rodríguez Méndez para probar su reclamación de responsabilidad estricta por productos defectuosos, el Tribunal de Apelaciones se limitó a precisar que "el mero hecho de que una parte que se opone a que se dicte sentencia sumaria no controvierta asuntos contenidos en dicha solicitud no implica, necesariamente, que se va a resolver a favor del promovente". Apéndice, págs. 18-19. En ese ejercicio, analizó indistintamente los hechos pertinentes a ambas acciones y concluyó que, ante el resto de la evidencia sobre la cual se debía recibir prueba, el foro primario no había errado al negarse a desestimar la causa de acción en contra de AMO hasta tanto se presentase toda la prueba durante el juicio. Aún inconforme, AMO presentó una moción de reconsideración, que el foro apelativo intermedio declaró sin lugar.

En desacuerdo con el razonamiento de ambos foros judiciales, AMO presentó un recurso de certiorari ante este Tribunal. Señaló que el Tribunal de Apelaciones erró al confirmar la decisión del Tribunal de Primera Instancia que denegó su moción de sentencia sumaria ante la ausencia de prueba para configurar una causa de acción por productos defectuosos y por equiparar sus requisitos con los de una reclamación por impericia médica.

El 29 de mayo de 2015 expedimos el auto de certiorari y, con el beneficio de la comparecencia de ambas partes, procedemos a resolver la controversia incoada.

II.

A mediados del siglo pasado, mediante nuestra decisión en Mendoza v. Cervecería Corona, 97 DPR 499 (1969), exploramos por primera vez la doctrina de responsabilidad estricta de fabricantes o vendedores por la venta y distribución de productos defectuosos, denominada en el derecho consuetudinario como *strict product liability*.[3] En aquella ocasión reseñamos los inicios y el desarrollo histórico de esta normativa que reconoce que todos los actores que intervienen en la cadena de fabricación y

---

[3] Aclaramos que la nomenclatura que hemos empleado para describir esta doctrina de responsabilidad civil extracontractual no es la más apropiada. La corriente moderna ha preferido denominarla como responsabilidad "estricta" en lugar de "absoluta". Esto es fiel a la máxima de que, si bien la negligencia del demandado no es un requisito de la causa de acción, se debe probar la existencia de algún fallo en el producto que sea la causa adecuada de los daños sufridos por el demandante. Véase Daly v. Gen. Motors Corp., 575 P.2d 1162, 1166 (Cal. 1978).

distribución de un producto defectuoso responden solidariamente y sin necesidad de demostrar negligencia frente al perjudicado. Además, estudiamos la coexistencia paralela de esta figura dentro del derecho civil español y concluimos que su adopción en nuestro ordenamiento legal era la opción más razonable y que mejor respondía a las necesidades sociales de Puerto Rico. Íd., pág. 512. De esta forma, por vía judicial, establecimos y adoptamos en nuestra jurisdicción la norma de responsabilidad estricta por productos defectuosos.[4]

Una década más tarde, tuvimos la oportunidad de recurrir a los axiomas de esta figura ante controversias que involucraron la presencia de defectos de diseño en vehículos de motor. Véase National Car Rental v. Caribe Motors, 104 DPR 74 (1975) y Montero Saldaña v. Amer. Motors Corp., 107 DPR 452 (1978). En ese ejercicio, reafirmamos que el propósito de esta figura jurídica es asegurar que el costo de los daños resultantes de productos defectuosos sea

---

[4] Desde un punto de vista sustantivo, la legislación española vigente coincide con el sistema americano, al imponer al fabricante una responsabilidad objetiva "por los daños causados por productos que no ofrezcan la seguridad que cabría esperar". Esta "establece un sistema similar al de la responsabilidad estricta, bajo la cual una parte demandante debe demostrar el defecto de producto, que éste existía cuando el producto salió de la esfera del fabricante y que el producto le causó un daño mientras lo utilizaba de un modo razonable". Ramón P. Rodríguez Montero, Responsabilidad civil de profesionales y empresarios: aspectos nacionales e internacionales, 1era ed., España, Gesbiblo S.L., 2006, pág. 251.

sufragado por los fabricantes o vendedores que introdujeron los productos al mercado. Íd., pág. 461.[5]

Posteriormente, continuamos nuestra labor de conformar los contornos de esta doctrina en nuestra jurisdicción. Primero, en Rivera et al. v. Superior Pkg., Inc. et al., 132 DPR 115 (1992) atendimos una reclamación por un supuesto mameluco defectuoso que al incendiarse ocasionó que un empleado de una planta farmacéutica sostuviera graves quemaduras en su cuerpo. Luego, en Aponte v. Sears Roebuck de P.R., Inc., 144 DPR 830 (1998) profundizamos en el marco legal aplicable para los productos considerados defectuosos por la falta de advertencias o instrucciones adecuadas. Por tratarse de la primera vez que atendíamos una controversia sobre ese tipo de defecto en nuestra jurisdicción recurrimos al tratamiento doctrinal brindado por las cortes de los estados de New York y West Virginia, así como el *Restatement of the Law (Second) of Torts*. Véase Aponte v. Sears Roebuck de P.R., Inc., supra, pág. 841.

Así, luego de estos desarrollos jurisprudenciales, quedó establecido que para entablar una acción de responsabilidad estricta por productos defectuosos en nuestra jurisdicción un demandante debe demostrar: (1) **la existencia de un defecto en el producto**, ya sea de fabricación, de diseño, o por la insuficiencia de

---

[5] Esos precedentes fueron fundamentados y desarrollados en los principios expuestos por el Tribunal Supremo de California en el caso normativo Greenman v. Yuba Power Products, Inc., 377 P.2d 897, 900 (Cal. 1962).

advertencias o instrucciones; (2) el defecto existía cuando el producto salió del control del demandado; (3) el demandado debe estar en el negocio de vender el producto; en palabras del *Restatement of the Law (Third) of Torts (Prod. Liab.)* sec. 1. se trata de una persona "who is engaged in the business of selling the product[…]"; (4) **el defecto es la causa adecuada de los daños del demandante**; y (5) el producto fue utilizado para un uso razonable y de manera previsible por el demandado.

En cuanto a los defectos de fabricación, este Tribunal adoptó la definición de "defecto" sugerida por el entonces Juez Presidente del Tribunal Supremo de California, Hon. Roger J. Traynor, a los efectos de que "un producto defectuoso puede ser definido como aquel que falla en igualar la calidad promedio de productos similares." Rivera et al. v. Superior Pkg., Inc. et al., supra, pág. 128. En palabras del máximo foro judicial de New York, el desperfecto surge ante la incapacidad del producto de desempeñar su función de la manera prevista como consecuencia de alguna falla en su proceso de producción o creación. Denny v. Ford Motor Co., 662 N.E.2d 730, 736 n. 3 (N.Y. 1995).

Por su parte, un defecto de diseño no puede identificarse simplemente mediante la comparación del producto que produjo el daño con los planos del fabricante o con otras unidades de la misma línea de producción, ya que, por definición, todas esas unidades poseerán el mismo

diseño. Véase Rivera et al. v. Superior Pkg., Inc. et al., supra, pág. 128, n. 7. En ese sentido, el concepto de defecto de diseño se moldeó con el tiempo hasta componerse de un análisis bipartito constituido por los escrutinios conocidos como el *Consumer Expectations y el Risk Utility*. Íd., pág. 129, n. 9. El tribunal de mayor jerarquía de New York ha articulado ambos escrutinios de la siguiente forma: "[A] defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use," and "whose utility does not outweigh the danger inherent in its introduction into the stream of commerce". Hoover v. New Holland N. Am., Inc., 11 N.E.3d 693, 701 (N.Y. 2014).

Finalmente, por defecto de información se entiende la ausencia en el producto de advertencias o instrucciones acerca de los riesgos previsibles vinculados con su utilización. Como consecuencia, hemos reconocido que un producto puede ser defectuoso si el fabricante o vendedor omite: (1) ofrecer instrucciones sobre el manejo del producto; (2) advertir sobre posibles riesgos en el uso del producto, ya sean latentes u ocultos; (3) alertar sobre las consecuencias dañinas que puedan surgir al utilizar el producto de forma incorrecta, o (4) proporcionar instrucciones sobre la forma de evitar lesiones. Aponte v. Sears Roebuck de P.R., Inc., supra, pág. 841. Lo esencial es determinar si la información provista por el fabricante

o vendedor fue adecuada, tomando en cuenta la naturaleza del producto y sus posibles usos. Íd.

Si bien el fabricante tiene la obligación indelegable de diseñar y producir un producto que no sea defectuoso, ese deber se mide a partir del momento en que el producto es puesto en el mercado. Robinson v. Reed-Prentice Div. of Package Mach. Co., 403 N.E.2d 440, 443 (N.Y. 1980). Una vez establecida la presencia de un defecto, los daños sufridos pueden ser reclamados por cualquier persona que previsiblemente pueda estar en riesgo por el producto y no es necesaria la existencia de una relación contractual con el fabricante. Véase David G. Owen, The Evolution of Products Liability Law, 26 Rev. Litig. 955 (2007). Véase, también, Ramón P. Rodríguez Montero, Responsabilidad civil de profesionales y empresarios: aspectos nacionales e internacionales, 1era ed., España, Gesbiblo S.L., 2006, pág. 243.

Ahora bien, aunque el demandante no tiene que establecer la negligencia del fabricante, este último "no es asegurador absoluto de todos los daños que puedan ser ocasionados por sus productos". Aponte v. Sears Roebuck de P.R., Inc., supra, pág. 841. Es necesario determinar si el fabricante sabía o debió haber sabido del peligro o riesgo implicado. Íd. El fabricante solo es responsable de los daños sufridos por el demandante cuando este haya brindado un uso razonablemente previsible al producto. Íd., pág. 839. Un fabricante no es garante de las lesiones que

resultan de alteraciones o modificaciones sustanciales realizadas por un tercero sobre el producto que lo torna defectuoso o inseguro. Hoover v. New Holland N. Am., Inc., 11 N.E.3d 693, 702 (N.Y. 2014). Esta norma, reconocida como la defensa de modificación sustancial, está destinada a aislar a los fabricantes y los otros sujetos en la cadena de distribución de la responsabilidad por los daños que nunca se habrían producido de no ser por la variación posventa del producto que, de otro modo, no era defectuoso. Íd., pág. 704.

Como resultado, la utilización incorrecta y la modificación sustancial de un producto configuran una defensa aplicable frente a productos que no presentaban un defecto cuando salieron del ámbito de control del fabricante pero, en un momento posterior, sufrieron algún vicio como consecuencia de un uso incorrecto o una alteración sustancial en su forma originaria.[6] No se puede esperar que un fabricante sea responsable por los agravios sufridos cuando un producto seguro es modificado de tal manera que pasa a ser defectuoso o cuando se le brinda un uso imprevisible e irrazonable que lo torna en peligroso. En otras palabras, un fabricante no tiene la obligación legal de anticipar todas las posibles adaptaciones de su

---

[6] Las "causas de exoneración y reducción" de responsabilidad que prevé la legislación española vigente son similares a las que admite la jurisprudencia americana. Véase Ramón P. Rodríguez Montero, op. cit., págs. 253-254.

producto ni de garantizar que el producto sea incapaz de causar lesiones en todas sus posibles aplicaciones.

No empece lo anterior, el fabricante sí tiene la obligación de anticipar aquellos usos o modificaciones que un comprador puede previsiblemente practicar. La defensa discutida solo opera en aquellos supuestos en los que el fabricante no podía haber previsto razonablemente la actuación incorrecta o la alteración realizada en su producto. Es precisamente por esto, que la doctrina de responsabilidad estricta le exige ofrecer aquellas instrucciones sobre el manejo adecuado del producto y alertar sobre las consecuencias dañinas previsibles que puedan surgir al utilizar, correcta o incorrectamente, el producto. Simultáneamente, debe advertir sobre los posibles riesgos que le constan en el uso del producto. Aponte v. Sears Roebuck de P.R., Inc., supra, pág. 841.

Lo dicho hasta aquí supone que un fabricante o vendedor puede ser responsable frente al perjudicado si sabía o le era viable saber de peligros inherentes en el uso inadecuado del producto, como lo es no brindarle el mantenimiento o la limpieza correspondiente, pero falló en incluir advertencias o instrucciones adecuadas al respecto. En estas situaciones, la defensa de modificación sustancial únicamente procederá si el fabricante demuestra que el mal uso era imprevisible como cuestión de derecho. Véase Hoover v. New Holland N. Am., Inc., supra, pág. 704.

III.

La controversia que atendemos nos exige, una vez más, examinar el mecanismo procesal de la sentencia sumaria instituido en nuestra Regla 36 de Procedimiento Civil, 32 LPRA Ap. V. R. 36. La función esencial de la sentencia sumaria es permitir en aquellos litigios de naturaleza civil que una parte pueda mostrar previo al juicio que, tras las partes contar con la evidencia que ha sido debidamente descubierta, no existe una controversia material de hecho que deba ser dirimida en un juicio plenario y, por lo tanto, el tribunal está en posición de aquilatar precisamente esa evidencia para disponer del caso ante sí. Véase Lugo Montalvo v. Sol Meliá Vacation Club, Op. de 2 de diciembre de 2015, 2015 TSPR 159, 194 DPR ___ (2015). Por eso, hemos reseñado que con este mecanismo procesal se facilita la solución justa, rápida y económica de un pleito cuando no existe un conflicto genuino en torno a los hechos materiales que componen la causa de acción que se contempla. Oriental Bank v. Perapi, 192 DPR 7, 25 (2014). En efecto, el tribunal queda facultado para disponer sumariamente de la controversia ante su consideración sin la necesidad de celebrar un juicio debido a que, precisamente por la ausencia de controversia sobre los hechos materiales en los que se funda el pleito, únicamente resta aplicar el derecho. SLG Zapata Berríos v. J.F. Montalvo Cash & Carry Inc., 189 DPR 414, 430 (2013).

Para poner en marcha este mecanismo procesal, la parte promovente debe establecer su derecho con claridad y demostrar que en ese momento no existen hechos materiales en controversia. Ramos Pérez v. Univisión, 178 DPR 200, 213 (2010). A continuación, la parte promovida puede oponerse a que el tribunal disponga de la controversia por esta vía procesal. No obstante, esa parte carga con el deber de señalar específicamente los hechos que entiende que están en controversia y que pretende controvertir, así como de detallar la evidencia admisible en la que sostiene su impugnación. SLG Zapata Berríos v. J.F. Montalvo Cash & Carry Inc., supra, pág. 432. De igual modo, puede también someter hechos materiales adicionales que no están en disputa y que impiden que se dicte sentencia sumaria. En fin, la persona que se oponga a que se dicte sentencia sumaria debe controvertir la prueba presentada. Ramos Pérez v. Univisión, supra, pág. 215.

En ese escenario, la parte promovida no puede simplemente descansar en sus alegaciones cuando la moción de sentencia sumaria está sustentada con prueba. Para derrotar la moción no basta con presentar meras afirmaciones. Si lo hace se corre el riesgo de que se acoja la solicitud de sentencia sumaria y se resuelva en su contra. Íd. Es por esto que la Regla 36.3(c) de Procedimiento Civil, 32 LPRA Ap. V. R. 36.3(c), permite que el tribunal dicte sentencia sumaria a favor del promovente si la parte contraria no responde de forma detallada y

específica a una solicitud formulada debidamente. SLG Zapata Berríos v. J.F. Montalvo Cash & Carry Inc., supra, pág. 432. Sin embargo, el mero hecho de no oponerse a la solicitud de sentencia sumaria no implica necesariamente que esta proceda si existe una controversia legítima sobre un hecho material. Íd. Queda claro que la sentencia sumaria debe proceder como cuestión de derecho.

En nuestro ordenamiento adoptamos el modelo de sentencia sumaria por insuficiencia de prueba acuñado en la esfera federal. Véase Medina v. M.S. & D. Química P.R., Inc., 135 DPR 716 (1994). Del mismo modo, reconocimos que la parte demandada puede promover esa solicitud. Véase Pérez v. El Vocero de PR, 149 DPR 427 (1999). Esta modalidad procede cuando la parte demandante no cuenta con evidencia suficiente para probar su caso y requiere del promovente establecer que: (1) el juicio en su fondo es innecesario; (2) el demandante no cuenta con evidencia suficiente para probar algún hecho esencial a su reclamación, y (3) como cuestión de derecho, procede la desestimación de la reclamación. Ramos Pérez v. Univisión, supra, págs. 217-218.

Esta modalidad cobra aún más pertinencia en nuestro ordenamiento donde la figura del juzgador de los hechos y del derecho en los pleitos civiles recae enteramente sobre el juez. Distinto a las jurisdicciones donde rige el juicio por jurado en el ámbito civil, en nuestro sistema judicial es el juez quien el día del juicio escuchará la misma

evidencia con la cual ya cuenta desde el momento en que culminó el descubrimiento de prueba y se le presentó como parte de una moción de sentencia sumaria. Así, en nuestro ordenamiento procesal es el juez el único examinador llamado a dirimir si una parte cumple con su carga probatoria para establecer la causa de acción que invoca.

Ahora bien, para disponer del pleito mediante una solicitud de sentencia sumaria por ausencia de prueba es indispensable que se le haya brindado a la parte promovida amplia oportunidad para realizar un descubrimiento de prueba adecuado y debe quedar demostrado que, una vez este concluye, la prueba descubierta no satisface los elementos necesarios para establecer su causa de acción. Claro está, consumado un descubrimiento de prueba adecuado, la parte promovida deberá presentar una oposición a la solicitud de sentencia sumaria debidamente fundamentada. No puede evadir la moción del promovente bajo el mero pretexto de que, a pesar de no contar con evidencia suficiente para probar un elemento indispensable para su reclamación, merece su "día en corte".

IV.

En su recurso de certiorari, la parte peticionaria, AMO, afirma que a pesar de que los foros recurridos encontraron la falta o no de mantenimiento como un hecho en controversia, este es inmaterial para disponer del caso por la vía sumaria. Es decir, arguye que si el equipo utilizado durante el procedimiento quirúrgico del señor Rodríguez

Méndez se encontrara o no esterilizado o limpio "no tiene absolutamente nada que ver" con su responsabilidad, ni con la reclamación por productos defectuosos. Certiorari, pág. 30. Sin embargo, según discutido a continuación, esa aseveración es incorrecta.

Como afirmamos anteriormente, el fabricante de un producto y todos los participantes en la cadena de distribución tienen la obligación de insertar en el mercado productos que se encuentren libres de defectos. Este deber no es irrestricto y se extiende a aquellos usos o cambios previsibles que un comprador o usuario podría efectuar al utilizar razonablemente el producto bajo examen. Ante este marco doctrinal, AMO viene llamada a proveer aquellas instrucciones y advertencias en torno al uso apropiado y el cuidado adecuado que se le debe brindar a su producto para que al ser utilizado, según contemplado, no cause lesiones. En ese sentido, la insuficiencia de instrucciones en torno al mantenimiento apropiado y común para un producto podría conllevar la imposición de responsabilidad estricta bajo la modalidad de advertencias inadecuadas.

En este punto, sí coincidimos con la apreciación de AMO en torno a la importancia de diferenciar las causas de acción presentes en este caso. Por un lado, la responsabilidad extracontractual de AMO no emana de los posibles actos u omisiones del doctor Del Toro al no brindarle el mantenimiento correspondiente al producto. De ser ese el caso, AMO respondería al no proveer las

advertencias necesarias sobre los peligros, usos o alteraciones previsibles al producto. Por otro lado, si AMO proporcionó instrucciones adecuadas y fue el doctor Del Toro quien se apartó del uso razonable de la maquinaria quirúrgica o no le brindó el mantenimiento requerido los recurridos solo podrían solicitar indemnización por la falta de cuidado del galeno bajo una teoría de negligencia.

En vista de lo anterior, es incorrecto el argumento de AMO en torno a que no ostenta ningún deber legal frente al peticionario aquí perjudicado bajo la doctrina de responsabilidad estricta por productos defectuosos. Reafirmamos que esta doctrina salvaguarda que los fabricantes y vendedores introduzcan productos seguros en el mercado y adviertan a los consumidores sobre la manera adecuada de utilizarlos, así como de los riesgos que puedan ocurrir al apartarse del manejo indicado.

Ahora bien, AMO objeta el que se denegara su moción de sentencia sumaria por insuficiencia de la prueba, ya que los recurridos no cuentan con evidencia suficiente para establecer una causa de acción en su contra bajo la doctrina de responsabilidad estricta por productos defectuosos. A tales efectos, advierte que los recurridos no pueden establecer cuál es el defecto del equipo que AMO distribuyó, ni demostrar que ese defecto fue la causa adecuada de sus daños.

En su demanda los recurridos denunciaron que el equipo *Microkeratomo* distribuido por AMO y utilizado durante la

operación de corrección visual estaba defectuoso porque quedaron partículas en los ojos del señor Rodríguez Méndez. AMO refutó la existencia de un defecto, así como su relación causal con los daños, y apoyó tal contención en el testimonio bajo juramento del señor Rodríguez Méndez, del doctor Teich y del doctor Del Toro. Antagónicamente, la opinión del perito de los recurridos establece claramente que aun de existir partículas de metal del *Microkeratomo* en los ojos del señor Rodríguez Méndez estas no guardan relación con las complicaciones alegadas. Además, el experto dijo que no tenía una base razonable para sospechar que la condición de DLK se debió a un problema con el equipo utilizado. **Igualmente, el señor Rodríguez Méndez aceptó desconocer la existencia de algún defecto en el equipo utilizado en su operación.** Al intentar controvertir esa prueba, los recurridos se limitaron a exponer alegaciones imprecisas, retóricas y conclusivas cuyo único efecto fue establecer que no es normal que se hallen partículas de metal en los ojos. En ese extremo, su oposición a la moción de sentencia sumaria es, de su faz, deficiente e insuficiente.

Correspondía a los recurridos demostrar que: (1) el equipo de AMO posee un defecto, en cualquiera de sus modalidades; (2) el defecto existía cuando el producto salió del control de AMO; (3) AMO se encuentra en el negocio de vender ese tipo de producto; (4) el defecto fue la causa adecuada de la condición que desarrolló el señor

Rodríguez tras la intervención quirúrgica; y (5) el doctor Del Toro usó el producto de manera razonable y previsible por AMO. **Sin embargo, resulta patente que los recurridos no lograron establecer que el equipo de AMO sufre de un defecto de fabricación, fue diseñado defectuosamente, o no fue acompañado por advertencias adecuadas, ni la relación causal entre el defecto alegado y sus daños.** Peor aún, no refutaron el hecho incontrovertido de que la condición DLK no está relacionada con algún posible defecto que pudiera tener el equipo. Es decir, aun cuando el señor Rodríguez Méndez hubiera tenido partículas metálicas en sus ojos por un desperfecto en el equipo quedó demostrado firmemente por la prueba pericial de ambas partes que esto no fue lo que causó la condición DLK. Además, AMO demostró que esa condición puede surgir como complicación de la operación LASIK a la que fue sometido el señor Rodríguez Méndez, independientemente de cuál fue el equipo utilizado. Los recurridos aceptaron este último hecho.

Luego de un análisis sosegado del expediente, apreciamos que están presentes todos los elementos para la procedencia de una sentencia sumaria por insuficiencia de prueba. La inclusión de AMO en el juicio en su fondo es innecesaria debido a que los recurridos no cuentan con evidencia para probar la existencia de un defecto y, mucho menos, que este fue la causa adecuada de la condición DLK que el señor Rodríguez Méndez desarrolló tras su intervención quirúrgica. Por esa razón, los recurridos no

pueden establecer los elementos esenciales de su reclamación y procede la desestimación de su demanda contra AMO.

No podemos pasar por alto que el descubrimiento de prueba en este caso se extendió por diez años y los recurridos tuvieron una oportunidad amplia para obtener la evidencia necesaria para establecer los elementos de su causa de acción. Es impermisible, bajo nuestro esquema procesal civil, que al analizar una moción de sentencia sumaria por insuficiencia de la prueba los tribunales aseveren lacónicamente que es inevitable verter la prueba en un juicio plenario cuando a todas luces la parte demandante no pudo establecer, como mínimo, los elementos de su causa de acción. Ir a juicio en esas circunstancias sería un ejercicio fútil.

Ante la clara ausencia de prueba y el incumplimiento de los recurridos con la Regla 36.3 de Procedimiento Civil, supra, al no controvertir los hechos propugnados por la parte peticionaria, luego de consumado un descubrimiento de prueba adecuado, procede desestimar la causa de acción, como cuestión de derecho, contra AMO por responsabilidad estricta originada por un producto defectuoso. Aclaramos que la presente Opinión no pasa juicio sobre la causa de acción de los recurridos por alegada impericia médica y los allí demandados no acudieron ante este foro.

V.

Por los fundamentos antes expuestos, se dicta sentencia en la que se revoca la resolución del Tribunal de Apelaciones y se desestima la demanda en cuanto a AMO.




                          RAFAEL L. MARTÍNEZ TORRES
                              Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Enrique Rodríguez Méndez, et als

     Recurrido

        v.                    CC-2015-0175

Laser Eye Surgery Management of Puerto Rico, Inc., et al.

     Peticionaria

Sentencia

En San Juan, Puerto Rico, a 15 de junio de 2016.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se dicta sentencia en la que se revoca la resolución del Tribunal de Apelaciones y se desestima la demanda en cuanto a AMO.

Lo acordó el Tribunal y lo certifica el Secretario del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez concurrió con el resultado sin opinión escrita.

Juan Ernesto Dávila Rivera
Secretario del Tribunal Supremo