Hoeben v FCA US LLC (2025 NY Slip Op 51416(U))

[*1]

Hoeben v FCA US LLC

2025 NY Slip Op 51416(U)

Decided on September 4, 2025

Supreme Court, New York County

Ramseur, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 4, 2025
Supreme Court, New York County

Wendi Hoeben, AS ADMINISTRATRIX OF THE ESTATE OF ANDREW R.T., DECEASED, H.A.T., AN INFANT, BY HIS MOTHER AND NATURAL GUARDIAN WENDI HOEBEN, AND WENDI HOEBEN, INDIVIDUALLY, Plaintiff,

against
FCA US LLC, CHRYSLER GROUP LLC, NEW CARCO ACQUISITION LLC, TRW AUTOMOTIVE U.S. LLC, ZF FRIEDRICHSHAFEN AG, ZF TRW AUTOMOTIVE HOLDINGS CORP., KELSEY HAYES COMPANY, TRW VEHICLE SAFETY SYSTEMS INC., GENERAL MOTORS LLC, JOHN DOE NOS. 1-25, JOHN DOE COMPANIES NOS. 1-25, JOHN DOE NOS. 26-50, JOHN DOE COMPANIES NOS. 26-50, AND JOEL ALVES, Defendant.

Index No.153682/2018

Plaintiff: Carmine Rubino, Esq.; Pani Nein Vo, Esq. of Kramer, Dillof, Livingston & Moore
FCA: Peter J. Fazio, Esq. and Pattrick P. Mevs, Esq., of Aaronson, Rappaport, Feinstein & Deutsch; Andreas Ringstad, of Campbell Controy & O'Neil
ZF Active: unrecorded
GM: Steven Kramer, Esq. of Eckert Seamans Cherin & Mellott LLC; Michelle M. Bendetto, Esq., of Kaufman Borgeest & Ryan

Dakota D. Ramseur, J.

The following e-filed documents, listed by NYSCEF document number (Motion 016) 237, 238, [*2]239, 240, 241, 242, 243, 244, 245, 246, 247, 248, 249, 250, 293, 294, 295, 296, 297, 298, 299, 300, 301, 302, 303, 304, 305, 306, 307, 308, 309, 310, 311, 312, 313, 314, 315, 316, 317, 318, 319, 320, 321, 322, 323, 324, 325, 326, 327, 328, 329, 330, 331, 332, 333, 334, 435, 436, 437, 438, 439, 440, 441 were read on this motion to/for DISMISSAL.
The following e-filed documents, listed by NYSCEF document number (Motion 017) 251, 252, 253, 254, 255, 256, 257, 258, 259, 260, 261, 262, 263, 264, 265, 266, 267, 268, 269, 270, 271, 272, 273, 274, 335, 336, 337, 338, 339, 340, 341, 342, 343, 344, 345, 346, 347, 348, 349, 350, 351, 352, 353, 354, 355, 356, 357, 358, 359, 360, 361, 362, 363, 364, 365, 366, 367, 368, 369, 370, 371, 372, 373, 374, 375, 376, 377, 378, 379, 380, 381, 382, 383, 384, 385, 386, 387, 388, 389, 390, 391, 392, 393, 442, 443, 444, 445, 446 were read on this motion to/for DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 018) 275, 276, 277, 278, 279, 280, 281, 282, 283, 284, 285, 286, 287, 288, 289, 290, 291, 394, 395, 396, 397, 398, 399, 400, 401, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428, 429, 430, 431, 432, 433, 434, 447, 448 were read on this motion to/for JUDGMENT - SUMMARY.
In April 2018, plaintiff Wendi Hoeben, individually, as administratrix of the Estate of Andrew T. (her husband), and as guardian of infant H.A.T., commenced this product liability action against, among others, defendants FCA US LLC (hereinafter, "FCA"), General Motors LLC, ZF Active Safety US Inc ("ZF Active"), and Joel Alves. On February 25, 2017, Alves lost control of the 2009 Dodge Ram he was driving, veered into the oncoming lane, and struck the 2016 GMC Acadia in which plaintiff, her husband, and their infant child were traveling. The accident killed plaintiff's husband and caused significant injuries to both her and their infant. In her complaint, plaintiff alleges that the Dodge Ram's Electronic Stability Control Systems ("ESC") and Traction Control Systems ("TCS") failed to intervene when Alves lost control, which should have happened had these systems not contained various design, manufacturing, and/or warning defects.
Plaintiff's first four causes of action are interposed against FCA and ZF Active for (1) design, manufacturing, and warning defects in the 2009 Dodge Ram, (2) negligence, (3) breach of express warranties, and (4) breach of implied warranties. Causes of action (5) through (8) are asserted against GM, as the maker of the 2016 GMC Acadia, and mirror those asserted against FCA and ZF Active. The ninth is asserted against Alves for negligence. And the four remaining causes of action—for (10) wrongful death, (11) Hoeben's loss of services, consortium, and companionship, (12) infliction of emotional distress on Hoeben, and (13) infliction of emotional distress on H.A.T—are asserted against all defendants.
In motion sequence 016, FCA moves for summary judgment pursuant to CPLR 3212 on plaintiff's strict products liability and breach of warranties claims; in motion sequence 017, GM moves for summary judgment on all claims asserted against it pursuant to the same rule; and in motion sequence 018, ZF Active moves for summary judgment on plaintiff's strict product liability, negligence, and breach of warranty claims. Plaintiff opposes. The motions are consolidated for resolution herein. For the following reasons, each motion is granted in part.
BACKGROUND
On February 25, 2017, at approximately 4:30 p.m., Alves was driving his 2009 Dodge Ram northbound on Route 206 through what he described as clear, dry conditions. (NYSCEF doc. no. 241 at 102, 110, Alves dep. transcript.) Shortly thereafter, as he was passing Downsville, New York, the weather quickly began to change into frozen rain or hail. (Id. at 130; see also NYSCEF doc. no. 260 at 116, Hoeben dep. transcript [corroborating that weather changed and started to become more of an icy rain]; NYSCEF doc. no. 240 at 1, New York State Accident Report [describing the weather at the time of investigation was snowing and the roadway surface covered in snow].) After exiting an uphill right curve, he testified that he started to lose control of the vehicle, which began to hydroplane. To stop the sliding, Alves attempted to apply the brakes slowly, but the Dodge Ram did not respond, at which time he attempted to regain control by using the gas. (Id. at 134-135.) Without control, the vehicle started veering left across the road's solid double yellow line and into oncoming traffic. (Id.) At about 4:42, the Dodge Ram struck the 2016 GMC Acadia driven by Andrew T. Data downloaded from the two vehicles at the time of accident reveals that the Dodge Ram was traveling approximately 57-58 miles per hour but slowed to 46 m.p.h. immediately prior to contact while the Acadia was traveling approximately 32 m.p.h..[FN1]
(See NYSCEF doc. no. 240 at 6.) Neither party was traveling above the posted speed limit. The point of impact was approximately one foot within the southbound line where the Acadia was driving. (Id. at 2.)
\Motion Sequences 016 and 018: The 2009 Dodge Ram [FN2]

The Dodge Ram, like all vehicles, is onboarded with ESC and TCS systems that may assist the driver in maintaining control over the vehicle in adverse conditions. The National Highway Traffic Safety Administrative has defined an ESC system as having, among other features, the capacity to augment vehicle directional stability by applying and adjusting brake torques to individual wheels, automatically adjust inputs to limit any oversteering or understeering, and determine and correct its yaw rate (or the rate at which vehicle's angular velocity rotates around its vertical axis). (See Plaintiff's exhibit A, Hannemann affidavit at ¶11.) The Dodge Ram's ESC system uses eight sensors to measure variables such as the vehicle's steering wheel angle, brake pressure, throttle position, road wheel speeds, lateral acceleration, yaw rate, and roll rate, which an electronic control unit (also referred to as "EHCU" or "EBCM" in ZF Active's motion papers) processes in order to monitor how the driver is driving and whether vehicle's movements correspond. (NYSCEF doc. no. 245 at ¶ 6, Tandy expert aff.; [*3]Hannemann aff. at ¶ 13.) If one of the variables exceeds a specified acceptable range, the electronic control unit may intercede. For example, if the ESC system calculates an excessive yaw, the control unit may send a signal to apply a brake to the outside front wheel; if the system calculates excessive plow, the rear brake may be applied. (Id.) "When a vehicle is not tracking like it's supposed to . . . , when the system notices that the driver's turning of the steering wheel and the vehicle responding do not match up, so you're out of control, the [ESC] system will activate." (NYSCEF doc. no. 244 at 43, Bielenda dep. transcript.)
The TCS system operates on similar principles. It monitors the speed of each wheel and compares that to the vehicle's longitudinal velocity. When the system detects a tire/wheel that is spinning at a speed higher than what is predicted by the vehicle's longitudinal speed, the TCS will apply, without driver intervention, a braking action at that wheel until its rotational speeds falls into a threshold level. (NYSCEF doc. no. 245 at ¶ 5.) This system is designed to prevent a specific danger—excessive spin rate—from interfering with the driver's directional control and may assist the ESC in performing its larger function. (Hannemann aff. at ¶ 12, 19.)
On the day of the accident, the Crash Data Retrieval system from the Dodge Ram recorded five seconds of pre-crash data. This data reveals that, at around five seconds before the crash, the vehicle was essentially steering straight as the right front, left front, and left rear wheel sensors recorded no significant slippage and the yaw rate was zero. (Hannemann aff. at ¶ 14.) However, the right wheel speed sensor was recorded as "SNA," meaning a signal was not available. (Id.) Between three and four seconds prior to impact, the left rear wheel speed sensor recorded a higher rotation than the two front wheels, which indicates rear wheelspin or an oversteer condition that is typically accompanied by a loss of directional control and yawning or "spinning." (Id.) Alves attempted to correct the spin by reducing his speed and turning the steering wheel right 316 degrees to counteract the yaw approximately 2.7 seconds prior to impact, but this was insufficient to prevent the collision. (Id.)
Additional data from the ESC system indicates the presence of a C102B fault "WSS_OPEN_REAR_RIGHT" at the time of the accident. According to both plaintiff's expert and FCA's, this fault arises when there is a disrupted wire connection between a wheel sensor, here the right rear sensor, and the control unit. (See Hannemann aff. at ¶15-16; NYSCEF doc. no. 245 at ¶8-10.) When this happens, something like a failsafe mechanism is initiated that completely inhibits the ESC and TCS systems from intervening, since, at least in theory, neither would be able to reliably determine what course(s) of action are required under given conditions. (Id.) Given the risk of driving without a computer assist, the ESC system displays warning lights on the driver's instrument panel, which was "ON" at the time of the crash. (NYSCEF doc. no. 245 at ¶8.) Both experts agree, within a reasonable degree of engineering certainty, that had the Dodge Ram's ESC and TCS systems been operating as designed, they would have provided Alves the requisite assistance to keep the vehicle's right rear tire from yawing or spinning into oncoming traffic and the accident would have been avoided.[FN3]
(NYSCEF doc. no. 245 at ¶7; [*4]Hannemann aff. at ¶ 16,19 [concluding that, at 0.7 seconds, vehicle sensors record a reversing yaw rate, showing sufficient traction for the ESC and TCS systems to assist regaining control].)
While FCA, ZF Active, and plaintiff all recognize that the Dodge Ram's ESC and TCS systems were not operating due to the disrupted connection between right wheel sensor and the electronic control unit, they dispute whether a manufacturing, design, or warning defect was the cause of this disruption.
Motion Sequence 017: The 2016 GMC Acadia
Plaintiff's causes of action against GM are premised on the passive safety and crashworthiness of the 2016 GMC Acadia in which she and her family were traveling. As described above, after Alves lost control of his Dodge Ram, the vehicle veered into oncoming traffic and struck the left front corner of Acadia approximately one foot within the southbound lane. Officer Ryan Telfer of the New York State Police Collision Reconstruction Unit testified that the collision "occurred outside the unibody [frame] of the [Acadia]." (NYSCEF doc. no. 261 at 89.) Otherwise known as a "small overlap frontal" collision ("SOF") [FN4]
, the crash resulted in an extensive intrusion in Andrew T.'s driver's side compartment. As expert Brian Herbst explains it, in the event of a crash, the idea behind "survival space" is to preserve the integrity of this compartment and minimize any intrusion so that the likelihood of injury to the occupant is reduced. (Id. at 15-16.) In his digital model of the accident, Herbst's measured the extent of the "deformation" of, or intrusion on, the driver's side compartment. (Herbst aff. at ¶12.) Using four data points labeled (A), (B), (C), and (D), the compartment collapsed rearward towards the driver's survival space a distance of, respectively, 28 inches, 27 in., 23 in., and 16 in. and inward toward the passenger side by another 13 in., 13 in., 12 in., and 12 in. (Id.)
The 2016 GMC Acadia is part of the Lambda platform, which includes models 2007 through 2016. Parties do not dispute that the Acadia complied with all Federal Vehicle Safety Standards ("FMVSS"), including standards related to the vehicle's structure, crash protection, and seat belt assemblies. (See NYSCEF doc. no. 269 at 128, Parmar dep. transcript.) However, neither the FMVSS full frontal collision test nor the National Highway Traffic Safety Administration ("NHTSA")'s New Car Assessment Program test assess a vehicle's response to SOF collisions. (Herbst aff. at ¶17.) In 2011, GM conducted an internal crash test of a Lambda platform vehicle, one structurally similar to, at least in Herbst opinion, the 2016 GMC Acadia. The test used the Insurance Institute for Highway Safety ("IIHS")'s newly introduced—but now industry recognized—SOF protocol. (Id. at ¶¶22-23.) In the test, the 2011 Lambda vehicle suffered extensive damage, including significant intrusion and collapse into the occupant [*5]compartment's survival space. (Id.) The overall vehicle rating, based upon intrusion measurements, was considered "poor." (Id.; plaintiff's exhibit GG.)
In response, GM redesign structural parts of the Acadia (plaintiff's exhibit W), which, per a second internal test of a Lambda vehicle, improved the vehicle's ability to reduce compartment intrusion. (Herbst aff. at ¶25.) This test (the C17687 test) revealed a 58.4% reduction of intrusion. (Id.) Had the redesigns been implemented in the 2016 Acadia, Herbst calculates that the data points from the crash would have been reduced, respectively, from 31 in. to 23, from 30 to 17, from 26 to 15, and from 21 to 8. (Id. at ¶24, 27; plaintiff's exhibit v.) In or around September that same year, GM utilized computer aided engineering ("CAE") to improve the design of these Lambda platform vehicles, which resulted in "computer iteration i143" and, according to Herbst, significantly reduced the intrusion to the occupant department. (Id. at 25-26; plaintiff's exhibit v.) Nonetheless, GM did not incorporate these changes into subsequent Lambda models like the 2016 GMC Acadia. (Id. at ¶¶ 31-35 ["GM abandoned all the other structural improvements and continued to sell the Lambda vehicles it knew had 'poor' structural performances in small overlap impacts"].)
Thus, even though the 2016 GMC Acadia conformed with, and even surpassed, all government safety standards set by FMVSS, GM and plaintiff dispute whether—even accounting for poor conditions, driver error, etc.— the vehicle should have and could have been designed in a manner that prevented Andrew T.'s death.
The Parties' Respective Arguments 
FCA's Contentions
As the Dodge Ram's manufacturer, FCA contends that it cannot be held liable based on the failure of the ESC and TCS systems to prevent the accident because, over the course of the vehicle's existence, unknown third parties had made substantial modifications to the wiring of the right rear wheel sensor that rendered it unable to send the required signals to activate the ESC and TCS systems. For evidence, FCA cites Alves' deposition testimony, wherein he averred that he purchased the vehicle in 2014, had the electrical systems serviced in or around 2017 after a warning light came on (NYSCEF doc. no. 258 at 61, Alves dep. transcript), and had it serviced again after experiencing issues with the vehicle's antilock braking system ("ABS") (id. at 71). Though Alves could not recall which auto mechanic repaired the braking system or articulate what the repair consisted of, FCA's expert, Donald Tandy, averred that it appeared that the right wheel connector had been modified in a way inconsistent with standard procedures described in the 2009 Dodge Ram service manual. (See NYSCEF doc. no. 245 at ¶10.) Specifically, he explained that the "wiring harness was at some point severed near the right wheel speed sensor connector" and that six "poor quality splice joints were used to attach an aftermarket sensor connector," at least one of which later failed. (NYSCEF doc. no. 245 at ¶¶10-12.) Further, photos and X-Ray images attached to his affidavit allegedly show the sensor wiring containing six "butt splice connectors" and corrosion on the butt splice that failed. (Id.) In FCA's view, then, a post-sale modification had rendered an otherwise safe vehicle defective, and it was this defect—not anything in the vehicle's original design—that caused the ESC and TCS systems to [*6]fail.
As to plaintiff's defective warning claim, FCA contends that the owner's manual for the 2009 Dodge Ram adequately warned of the inherent limitations of the ESC and TCS systems in helping maintain control over the vehicle and provided adequate information with respect to the "ESP/BAS warning light" that was visible on Alves' dashboard, including the instruction to "see your authorized dealer as soon as possible to have the problem . . . corrected." (NYSCEF doc. no. 247, owner's manual.) Given the adequacy of the warnings, along with Alves' admitted failure to read the owner's manual, FCA contends that the warnings did not proximately cause plaintiff's accident.
ZF Active's Contentions
ZF Active designed the ESC's electronic control unit (and not the "overall ESC system," which would include components such as wirings, sensors, and other connectors), which it sold to FCA for installation in the 2009 Ram. In its motion papers, ZF Active argues that it is not liable because (1) it safely designed a component of the larger ESC system in compliance with FCA specifications for later use, (2) the same post-sale modifications cited by FCA—and not any design defect in the control unit—were the proximate cause of plaintiff's accident, and (3) plaintiff's proposed safer alternative, whereby the ESC and TCS systems would continue functioning in a limited capacity even without sensory inputs, is not actually safer.
GM's Contentions
GM argues, first, that the Acadia was designed and manufactured safely and complied with all applicable road safety standards; but just as critically, it contends that there is no evidence that the injuries suffered by plaintiff, her husband, and their infant were more severe than they otherwise would have been had an alternative design been implemented. While acknowledging the Acadia's inability to meet standards set by the new IIHS test in 2011, they note that the Acadia's score concerning danger to occupant's head and neck was considered "good." (See NYSCEF doc. no. 269 at 288, Parmar dep. transcript [testifying that of 23 categories, 19 were rated "good" and 3 others were rated "acceptable"].) GM further suggests that Herbst's expert opinions cannot defeat its summary judgment motion because he (1) lacks specific expertise in the field of accident reconstruction, (2) he relied upon a computer-simulated test to support his claim, which contravenes testimony he previously gave in a different case, and (3) there is no basis to conclude that the subject crash was "substantially similar" to the SOF lab tests conducted in line with IIHS safety protocols.
Plaintiff's Contentions in Opposition
In a supplemental response to FCA's interrogatory, plaintiff identifies one of the design and manufacturing defects in the Dodge Ram as follows:
"The rear wheel speed sensor and their wiring are prone to failure due to unreliable sensor and wiring design . . . More specifically, the wheel speed sensor wire routing's [*7]close proximity to the truck's moving coil spring suspension and placement in front of the axle as well as the lack of adequate protection to the wiring itself, made the ABS/TCS/ESC systems more prone to damage from road debris or interaction with the coil spring under routine, normal, and foreseeable driving conditions. Such wiring damage and breaches were foreseeable and result in disruption/loss of signal from the wheel speed sensors." (NYSCEF doc. no. 327 at 15-16.)
In his affidavit, Neil Hannemann explained that, as designed, the wires connecting the ESC control unit with the rear wheel sensor dropped behind the rear axle near the wheel well and were fastened to the base of the coil spring, then routed forward to the front of the axle. Due to the increased length of the wire, then, it was increasingly exposed to debris and gravel projected by the vehicle's tire. (Hannemann aff. at ¶ 23.) Moreover, damage of this kind could develop without the vehicle accruing high milage: durability logs during design and development indicate that failures occurred in vehicles with milage between 8,000 and 30,000 miles. (Id. at ¶26.) In his view, the right rear wheel wire/sensor was damaged in this manner, which was why it required multiple repairs. (Id.) Instead, Hannemann opines that the wires should have been located behind the rear axle and had better wire shielding (what is referred to as "split loom sheathing"), both of which would have better protected the wire from damage. (Id. at ¶¶23-24.) In this light, given that she identified this defect during discovery, plaintiff argues that (1) FCA's failure to address this design defect in it motion papers precludes summary judgment as it cannot have made a prima facie showing that its vehicle was designed in a safe manner; and (2) she has demonstrated an issue of fact as to whether the vehicle contained a design defect.
As to FCA and ZF Active's design of the ESC system and the failsafe mechanism, Hannemann suggests two safer alternative designs were available in 2009 that would have reduced the ESC system's capacity but left it partially enabled. The first would have "employed a recovery mode" that still utilized a traction control engine; the second would have reverted from "4-channel to 2-channel operations," which would have allowed the ESC and TCS to maintain "fail-safe function with the loss of rear wheel speed sensor and would have provided the driver with sufficient assistance in maintaining control of the Ram." (Hannemann aff. at ¶ 32, 35 [explaining that, while not quite as effective as 4-channel systems, "2-channel yaw control systems demonstrate that rear wheel brake intervention and the rear wheel speed sensor is not a needed input to provide yaw control"].) He notes that this method had been used by General Motors in its utility vehicles prior to 2009 and in the racing industry for traction control. (Id. at ¶¶33, 35.) 
In support of her warning-defect claim, plaintiff submitted the affidavit of expert Anthony Andre, who concluded that the vehicle's three light indicators on instrument panel were ineffective in warning drivers of the possible dangers associated with an inoperable ESC system. As described above, when the ESC and TCS systems have been disabled, the systems will light a solid ABS MIL ("malfunction indicator lamp"), ESP Lamp, and ESP BAS light located, respectively, on the lower left, lower right, and lower center of the instrument panel. (Andre aff. at ¶12.) In Andre's view, while each of these lights were recorded as "ON" five seconds before the accident, these warnings are ineffective at conveying to drivers the safety concerns present when the ESC and TCS systems are not providing assistance. This is because: (1) the ABS MIL [*8]and ESP Lamp were not centrally located on the dashboard, (2) the ESP BAS light, while centrally located, is not well understood or intuitive, and (3) the three indicators are presented individually and not likely to be assimilated into a "single-integrated higher-order mental concept." (Id. at ¶21; see also NYSCEF doc. no. 327 at 21-22, interrogatory response 30.) As such, even though Alves admitted that he did not read the owner's manual, plaintiff contends that summary judgment is inappropriate because the warning lights—which Alves' did not notice were "ON"—were insufficient to alert him to the problem with the vehicle at the time of the crash.
Lastly, plaintiff contends that GM has not established entitlement to summary judgment since (1) "mere compliance with minimum industry standards" does not, in itself, preclude a finding of liability for negligence and defective design and (2) Herbst's exert affidavit identifies defects in the structure of the GMC Lambda line of vehicles that, in comparison to a readily identified alternative, exposed T. and the other occupants to greater risks of injury.
DISCUSSION
Under CPLR 3212 (b), a proponent moving for a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, producing sufficient evidence to eliminate any material issues of fact from the case. (Brandy B. v Eden Cent. School Dist., 15 NY3d 297, 302 [2010]; Kesselman v. Lever House Rest., 29 AD3d 302 [1st Dept 2006].) Once they establish their entitlement, the burden shifts to the opposing party to raise a triable issue of fact. (Zuckerman v City of New York, 49 NY2d 557, 562 [1980].) Since summary judgment is an extreme remedy, the Court must draw all reasonable inferences in favor of the non-moving party. (Vega v Restani Constr. Corp., 18 NY3d 499, 503 [2012].) Where there is doubt as to the existence of material facts or where different conclusions can reasonably be drawn from the evidence, summary judgment should be denied. (Udoh v Inwood Gardens, Inc., 70 AD3d 563, 565 [1st Dept 2010].)
Whether FCA is Entitled to Summary Judgment
Under New York law, a design defect may be actionable under a strict products liability theory if the product is not reasonably safe. (Denny v Ford Motor Co., 87 NY2d 248, 257 [1995] see also Voss v Black & Decker Mfg. Co., 59 NY2d 102, 107 [1083] ["to establish a prima facie case in strict products liability, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product design that it was not reasonably safe and the defective design was a substantial factor in causing plaintiff's injury"].) In assessing whether a product is "not reasonably safe," the issue becomes whether a reasonable person—aware of the alleged design defect at the time of manufacture—would have concluded that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." (Voss, 59 NY2d at 108; Adams v Genie Indus. Inc., 14 NY3d 535, 542 [2010].)
However, since the focus of a strict products liability claim is on the condition of the product when it left the defendant's control, a manufacturer may establish its prima facie entitlement to judgment by demonstrating that a third party performed a substantial modification [*9]on an otherwise safe product that then caused plaintiff's injury. (Hoover v New Holland, Inc., 23 NY3d 41, 56 [2014].) As Hoover explains, in such a case, the moving defendant must make the same showing required to prevail on any design defect: that the product was "not defective" when it was manufactured and sold; then, it must demonstrate that a post-sale modification rendered the product defective and proximately caused the plaintiff's injuries. (Id.; see Mercedes v 248 JD Food Corp., 184 AD3d 513, 513 [1st Dept 2020].)
In its motion papers, FCA invokes this third-party modification defense as grounds for summary judgment, arguing that the Dodge Ram was safely designed and manufactured and only subsequently rendered defective when the wiring that connected the rear wheel sensor to the ESC control unit was not properly repaired. The Court finds this argument unpersuasive. First, while plaintiff served an interrogatory response indicating that one vehicle design defect was the way in which the wires were placed in front of, as opposed to behind, the rear wheel axle (and thereby unnecessarily exposing it to additional wear and tear from gravel and other debris), FCA did not address this argument in moving for summary judgment and its expert, Donald Tandy, does not refer to this alleged defect in his affidavit. Thus, even as FCA engineer James Bielenda's testimony that the Dodge Ram complied with all federal safety standards (NYSCEF doc. no. 304 at 68, 121, Bielanda dep. transcript) undoubtedly amounts to some evidence that the vehicle was designed without a defect (Alicea v Gorilla Ladder Co., 181 AD3d 512, 512 [1st Dept 2020], citing Spiconardi v Macy's E., Inc., 83 AD3d 472, 473 [1st Dept 2011]), his testimony is simply insufficient, without more, to establish FCA's prima facie burden. That FCA has not met its initial burden is more apparent when considering the absence of any affirmative evidence showing the vehicle's wiring was safely designed: Tandy's affidavit, for example, does not compare the wiring of the Dodge Ram to other vehicles, cite industry standard, or make any other claim as to why the chosen design was implemented. Furthermore, though Tandy's expert opinions in reply cannot be used to establish FCA's a prima facie burden, it is worth pointing out that his reply is no more persuasive in demonstrating the safety of the original design. By only averring that "there is absolutely no evidence that the wires were damaged by road debris" (NYSCEF doc. no. 440 at ¶3, Tandy reply affidavit), he merely points to gaps in plaintiff's evidence. (See Dyer v Amchem Products Inc., 207 AD3d 408, 409 [1st Dept 2022] [pointing to gaps or deficits in plaintiff's case insufficient for defendant to meet prima facie burden].)
Second, even if compliance with federal safety standards were considered sufficient for purposes of establishing the vehicle's safety, plaintiff has raised issues of fact precluding summary judgment. Of course, the Court recognizes that a manufacturer is not obligated to design a machine that will never deteriorate (Hoover, 23 NY3d at 59) and the fact that the Dodge Ram had 201,960 miles at the time of the accident suggests that plaintiff's evidence for this defect may be thin; nonetheless, Hannemann's affidavit plausibly details why the post-sale modifications, i.e., the extensive repairs to the rear wheel sensor wiring, were in fact the product of an original design defect. He explained that his opinion was based on the inspection he conducted, which found no evidence of body, frame, suspension, or rear axle damage attributable to a previous accident, leaving open the possibility the damage to the wiring was from wear and tear. (Hannemann aff. at ¶20.) He further indicated that, given the potential exposure to debris and gravel kick up, the wiring should have been routed and fastened in a way that shielded the wiring against the particular vulnerability he identified. (Hannemann aff. at [*10]¶¶23.) "[finding the use of a sensor with a pigtail would allow the connector to be located to a safer location behind the wheel axle, fasteners and locator clips should have been used to fasten the sensor wires to the axle to prevent loose wires, and a shielding like a split loom—anything more than tape wrap—could have protected the wires from debris damage].)
Such a design would have comported with ones in similar 2009 pickup trucks like the Ford F-150, Chevrolet Silverado, Chevrolet Avalanche, and Toyota Tundra. (Id. at ¶25.) Instead, even with durability logs that indicated failures of the ESC system at relatively low mileages, between 8,000 and 30,000 (id. at ¶26), FCA did not implement said alternative designs. "Where a qualified expert opines that a particular product is defective or dangerous, describes why it is dangerous, explains how it can be made safer, and concludes that it is feasible to do so, it is usually for the jury to make the required risk-utility analysis." (Richards v Ford Motor Co., 198 AD3d 467, 468 [1st Dept 2021]; Reis v Volvo Cars of N. Am., Inc., 73 AD3d 420 [1st Dept 2010] [concluding automotive engineer's expert opinion that vehicle should have had starter interlock devices installed, which most likely would have prevented the accident and were available at time of manufacture, raised issue of fact as to reasonableness of design].) In reply, FCA asserts that Hannemann's conclusions are not supported by any evidence, that there is nothing to indicate that the sensor wires were damaged as Hannemann claims. (See NYSCEF doc. no. 435 at 4.) Even if accurate, however, this argument only raises FCA's failure to meet its initial prima facie burden, never having established that the wiring was safely positioned in the first place.
The Court further finds that plaintiff has raised an issue of fact as to whether the Dodge Ram should been programed so that the ESC and TCS systems remained enabled, instead of using a failsafe mechanism, when they no longer detect a signal from one of the wheel sensors. (See Hannemann aff. at ¶32; NYSCEF doc. no. 327, supp. interrogatory responses 25 ["The system should also have been designed to continue to function by maintaining driver assistance using front axle braking (2 channel ESC), engine throttle control, or by limiting vehicle speed/engine rpm"].)[FN5]
He proposes two methods: as described above, one would have used a recovery mode that utilized a traction control engine in the event of sensory loss; the other would have employed a recovery mode that reverted from 4-channel to 2-channel operations. (Id.) FCA, by contrast, disputes whether these modifications would have prevented the accident. In his reply, Tandy opines that a "recovery mode that utilized traction control engine . . . does not make sense to me since the TCS works by comparing the vehicle speed to the wheel speed . . . With a damaged sensor and no speed signal, the TCS cannot know when to apply the breaks." (NYSCEF doc. no. 440 at ¶5.) In addition, a 2-channel system would not have provided a benefit to Alves because such a system is used to apply the front wheel brakes, not those for the rear wheel where the problem arose. (Id. at ¶7.) The Court, then, has two functionally competing expert affidavits, from which, the trier of fact may or may not conclude that the two modifications would have been effective in assisting Alves regain control of the vehicle. (See Pierre-Louis v DeLonghi America, Inc., 66 AD3d 859 [2d Dept 2009] [finding conflicting expert opinions as to the reasonableness of the product's design created issues of fact]; Fritz v JGL [*11]Indus., 193 AD3d 641, 643 [1st Dept 2021] [finding summary dismissal of design defect unwarranted based on competing expert opinions].)
FCA's reliance on Richards v Ford Motor Co. (198 AD3d 467 [1st Dept 2021]) and Palladino v. A.P. Moller, Inc. (174 A.D2d 335 [1st Dept. 1991]) is misplaced. In Richards, the plaintiff's design and manufacturing defects against the vehicle manufacturer were based on its alleged propensity to rollovers. The First Department granted summary judgment because "plaintiff's expert assertions that the vehicle was unsafe and prone to rollovers was unsupported by any data or calculations concerning the testing he purportedly performed, testing he described in the most conclusory of terms." (Id.) In Palladino, a jury implicitly found that a third-party modification had rendered the product unsafe, which should have vitiated any award in favor of the plaintiff against the manufacturer. (Id.) Here, FCA made no initial showing that its product was safe with respect to the wiring design and issues of fact remain as to the alternate design approaches to the ESC and TCS systems. Lastly, neither FCA nor ZF Active propose an alternate reading of Hoover than that suggest by plaintiff. There, the Court of Appeals found material issues of fact where the plaintiff, like Hoeben, asserted that a component had been destroyed by "wear and tear." (Id.) Thus, the plaintiff's testimony, like Hannemann's here, raised question of fact as to whether the modification, rather than an initial design defect, was a substantial factor in causing the injuries alleged. Echoing Court of Appeals, while the Court is not suggesting that the wires were required to last for the lifetime of the Dodge Ram, FCA and ZF Active "did not adequately refute plaintiff's assertion that [the wires] failed prematurely."
FCA is also not entitled to summary judgment on plaintiff's failure to warn causes of action. It maintains that plaintiff's cause of action must fail because Alves admitted that he never consulted the owner's manual for guidance with respect to the vehicle's electronic stability control and braking systems (NYSCEF doc. no. 437 at 220-221, Alves dep. transcript.) In their view, under Reis (73 AD3d at 423), Alves' admission severs the causal connection between the failure to warn and the crash itself. However, while FCA is correct that, in certain circumstances, summary judgment should be granted where there is an absence of evidence that the "user of the product would read and heeded a warning had one been given" (id., citing Sosna v American Home Prods., 298 AD2d 158 [2002]), the First Department nonetheless recognized this issue is not dispositive where, like here, the focus of the failure to warn claim is on the fact that the warning was not prominently displayed. (Id., citing Johnson v Johnson Chem Co., 183 AD2d 64 [2d Dept 1992].) As Alves testified, "every time I needed some information, just to be curious, I would look at [the owner's manual]," that when something came up with the car and needed an answer, he would consult it. (NYSCEF doc. no. 438 at 50-51.) Given, then, that both Alves and his girlfriend Kelly McLaughlin testified that they did not notice warning lights on the dashboard in the year prior to the accident [FN6]
 (id. at 100-101, 123; NYSCEF doc. no. 437 at 28-30, McLaughlin dep. transcript), even when post-accident data revealed "ESP/BAS warning light" to [*12]have been "ON", the Court cannot find that "it is immaterial how prominent or conspicuous any warning" might have been. (See Reis, 73 AD3d at 423.)
Even if it is not entitled to dismissal based upon Alves' admissions, FCA argues that there are no genuine issues of fact since the owner's manual warnings clearly state the limitations of the ESC and TCS systems, including the fact that they cannot prevent all accidents, especially in poor road conditions. As the above demonstrates, there are plainly issues of fact as to whether the placement of the warning lights on the dashboard was sufficient to alert Alves and to impress upon him the need to review the owner's manual. And though FCA's expert, Nathan Dorris, disputes plaintiff's expert's conclusions—noting, among other issues, that NHTSA regulations do not specify where the ESC and ABS MIL warnings light must be placed on the instrument panel and peer research suggests users are likely to ignore properly designed warnings, even if they do not recall doing so (NYSCEF doc. no. 441 at ¶¶18-19)—his affidavit only serves to emphasize the number of issues that remain outstanding. For the all of above-described reasons, FCA is also not entitled to summary judgment on plaintiff's products liability and negligence causes of action.
Whether ZF Active is Entitled to Summary Judgment
Citing Third Department caselaw, ZF Active suggests it cannot be held liable for design defects in the ESC system because it only manufactured component parts in accordance with FCA's design, plans, and specifications. (See Leahy v Mid-West Conveyor Co., 120 AD2d 16, 19 [3d Dept 1986] [finding designer of entire product best situated to know its inherent dangers, not defendant manufacturers who "were not provided with the design and specifications of the entire system"]; Gray v R.L. Best Co., 78 AD3d 1346, 1349 [3d Dept 2010] [dismissing claim against component manufacturers who operated "with no knowledge of any inherent danger of the [underlying product].")[FN7]
ZF Active asserts that it supplied ESC's electronic braking control unit to FCA—not the entire ESC system, which would include the control module, sensors, wiring, connectors, and other parts. In demonstrating it was only a component manufacturer, it relies on its engineer who testified, "the specifications would have been provided at the time of quote for packaging, right, size, the performance of the vehicle" (NYSCEF doc. no. 286 at 40, Breitner dep. transcript) and "the [traction control] performance met the specifications that FCA wanted to meet" (id. at 105). There is no indication that Breitner intended to imply that ZF Active had no input in the process of developing this brake system.
As plaintiff points out, the ESC's electronic breaking unit—which, by ZF Active's own admission, interprets the incoming data from the incoming sensor data and provides stability control—is the subject of plaintiff's failsafe defective design theory and there is an abundance of [*13]evidence that demonstrates ZF Active had affirmative input in its design. For example, Breitner testified that "there was an extensive vehicle development process...Certainly, [ZF Active] would have been available. There would have been engineers in the vehicles working on the performance." (Id. at 34.) He described the "lengthy development process, working together with FCA engineers, ultimately doing drive signoffs and final vehicle level DVP&R [Design Verification Plan and Report] to reach a state where everything was in order." (Id. at 35.) Asked whether ZF Active was responsible for the design of the failsafe system, he responded, "ZF certainly would have the base level failsafe design already ready or adjusted, and then FCA would have input to that as well regarding failure modes and control breaks," that "certain faults would be ZF Active's responsibility because they have expertise," and that FCA and ZF Active "shared responsibility" for designing how the ESC system would respond when it detected a fault, what he refers to as a failsafe manual. (Id. at 35-37.) Elsewhere, he explained that ZF was responsible for designing the ESC control unit and its algorithm, which, again, remains a critical issue in this litigation. Accordingly, because ZF Active cannot be classified as a component manufacturer with no knowledge of the larger design of the ESC system, the Court finds that it is not entitled to summary judgment under Leahy or Gray.
ZF argues that it cannot be liable because of the unknown third-party modifications. Like FCA above, ZF Active did not establish the condition of the wiring to be safely designed in its original motion papers and, consequently, is also not entitled to summary judgment. (See Hoover, 23 NY3d at 59 [New York law "does not mandate summary disposal of cases where the plaintiff raises a colorable claim that the product was dangerous because of defectively designed safety feature and notwithstanding the modification by the third party"] [emphasis original].) Lastly, ZF Active submits the affirmation of Jeffrey Breitner, its brake control systems engineer, who avers that, had the ESC been programmed to intervene without full data, the system could take control away from a driver in inappropriate situations where the driver does not want, need, or expect such intervention. (NYSCEF doc. no. 282 at ¶¶16-17; see also NYSCEF doc. no. 286 at 231-237, Breitner dep testimony.) In his opinion, such a design, as proposed by Hannemann, would make the vehicle more dangerous—that not intervening when the ESC system is blind is safer. (Id.) The Court notes that this opinion aligns with Tandy's expert opinion. Yet, as shown above, the Court is compelled to find issues of fact as to whether the ESC and TCS systems could have and should have been designed in the manner Hannemann proposes.[FN8]

Whether GM is Entitled to Summary Judgment
In moving for summary judgment, GM maintains that the Acadia's NHTSA 5-safety rating, combined with the fact that it exceeded all federal government safety, demonstrates that it met its burden of showing that the vehicle was safely designed and manufactured at the time it [*14]was put on the market.[FN9]
Irrespective of whether this is true or not, the Court finds that issues of fact remain outstanding. To briefly re-summarize Herbst conclusions, he opined that the accident can be categorized as small overlap frontal collision; in 2011, the IIHS was developing a new crash test that assessed the effects of such an accident on the vehicle's frame; when tested against the new IIHS standards, a substantially similar Lambda vehicle rated poor; subsequent testing, including computerized testing, showed that GM had designed safer front seat occupant compartments, but these features were not installed on the 2016 Acadia.
In GM's view, the Court cannot rely on Herbst's affidavit in assessing whether plaintiff has identified a design defect. It cites People v Maricevic (52 AD3d 1043, 1046 [3d Dept 2008]) for the proposition that only experts in accident reconstruction can offer opinions on the causes of an accident. Yet it acknowledges that the issue there was whether a paramedic went beyond his "training, education, knowledge or experience" in testifying to the physics of an accident. (Id.) By contrast, Herbst is a mechanical and automotive safety engineer with the testing firm SAFE Laboratories, he holds a professional license in mechanical engineer in California, is a member of the Society of Automotive Engineers, the American Society of Mechanical Engineers, and the National Society of Professional Engineers, and has peer reviewed over eighty technical papers addressing automotive safety. (Herbst aff. at ¶¶2-7.) Moreover, he specifically states that he has twenty-five years of experience in areas including accident reconstruction and crashworthiness analysis. (Id. at ¶¶2,4.)
Accordingly, Herbst does not lack the expertise to opine that the IIHS SOF test is substantially similar to the at-issue crash. Nor has GM established that his opinions "are conclusory and not the product of reliable methodology": Ryan Telfer's testimony—that the impact occurred outside the unibody frame and at a speed above the IIHS protocol (see NYSCEF doc. no. 446 at 7)—does not address Herbst's methodology or the validity of his conclusions and GM offers no expert of its own to make its claim. If anything, Telfer's conclusions underscore the difference of opinions of two experts. Lastly, GM's argument that Herbst has undermined his conclusions herein by taking the opposite position when proffering expert opinions in other cases is one for the trier of fact. On this point, its reliance on Richards v Ford Motor Company (198 AD3d at 468) is unavailing: whereas the expert in Richards purportedly performed certain tests on the subject vehicle without describing their nature or doing so in "the most conclusory of terms," Herbst based his opinions GM's own computer simulations of the computer iteration il143 that yielded substantial reductions in the intrusions to the occupant compartments. Whether or not such a design was feasible as he asserts is a matter for the trier of fact, especially since, again, GM has produced no expert to refute his position.
GM has established entitlement to summary judgment on plaintiff's failure to warn claim. Neither Herbst nor Paul Lewis, plaintiff's damages expert, address this claim. There is no [*15]deposition testimony or expert opinion to support said claim let alone one to explain where or how such a warning should have been given. (See Reis, 73 AD3d at 423-424.) Nor is "flipping through" the owner's manual sufficient to show that the failure to warn was a proximate cause of her injuries. (Fredette v Town of Southampton, 95 AD3d 940, 942 [2d Dept 2012] ["Just looked through" the motorcycle's manual without recalling any particular pages insufficient to raise issue of fact regarding proximate cause], citing Sonsa v American Home Prods., 298 AD2d 158 [2002].)
Lastly, GM is entitled to summary judgment on plaintiff's cause of action for breach of an express warranty. Plaintiff did not identify an express warranty that was breached in her bill of particulars and her interrogatory responses. (See Mangano v Town of Babylon, 111 AD3d 801, 802 [2d Dept 2013].) Nor did she oppose this branch of the motion. 
The Court has considered the remaining contentions and found them availing.
Accordingly, for the following reasons, it is hereby
ORDERED that the branch of FCA US LLC's motion for summary judgment pursuant to CPLR 3212 is granted as to plaintiff Wendi Hoeben's causes of action for breach of express and implied warranties, but otherwise denied; and it is further
ORDERED that the branch of ZF Active Safety US Inc.'s motion for summary judgment pursuant to CPLR 3212 is granted as to plaintiff's causes of action for breach of express and implied warranties, but otherwise denied; and it is further
ORDERED that the branch of General Motors LLC's motion for summary judgment pursuant to CPLR 3212 is granted as to plaintiff's failure-to-warn cause of action and her breach of an express warranty cause of action, but otherwise denied; and it is further
ORDERED that plaintiff shall serve a copy of this order, along with notice of entry, on all parties within twenty (20) days of entry.
This constitutes the Decision and Order of the Court.
DATE 9/4/2025
DAKOTA D. RAMSEUR, J.S.C.

Footnotes

Footnote 1:This data was obtained from the two vehicles' Crash Data Retrieval System ("CDR").

Footnote 2:In this section, the Court lays out the undisputed facts as they relate to the 2009 Dodge Ram. The Court will then do the same for motion sequence 017 and the 2016 GMC Acadia before turning to the parties' contentions as to the alleged design, manufacturing, and warning defects identified in plaintiff's bill of particulars. Plaintiff does not oppose the branches of FCA's and ZF Active's motions for summary judgment on claims for breach of warranty. Accordingly, those causes of action are dismissed.

Footnote 3:Plaintiff's expert, Neil Hanneman, acknowledges that the ESC system developed by FCA and ZF Active, when active, was effective at preventing loss of control in test settings, including surfaces with ice and snow, when compared against a Dodge Ram with no active ESC system. (Hanneman aff. at ¶18.)

Footnote 4:In a left or right frontal offset collisions only about 25% percent of the frontal structure is engaged as opposed to head on collisions where which engage the full front structure. Offset collisions are the more common form of frontal collisions.

Footnote 5:The Court notes that, as with the wiring design, FCA's moving papers do not address this alleged design defect. 

Footnote 6:Alves testified that he became aware of a problem with the ABS system though a warning light on the dashboard but took it to get replaced thereafter. (NYSCEF doc. no. 438 at 71.) There is no indication the light remained on. The Court is not aware of any evidence that Alves, in FCA's words, "ignored the warning lights." (NYSCEF doc. no. 435 at 9.)

Footnote 7:The doctrine cited by ZF Active has only been applied in the context of a manufacturer who sold component parts that were to be used by another factory owner, whose own employee was subsequently injured. It has not cited to a case applying the doctrine to shield a manufacturer from liability to a consumer who used the defective product. Nonetheless, nothing in these opinions expressly limit the doctrine to wider applicability.

Footnote 8:In contrast to Hannemann, who specifically testifies that post-crash data reveals that there was sufficient traction for the ESC and TCS systems to regain control (NYSCEF doc. no. 245 at ¶7; Hannemann aff. at ¶ ¶16,19), no such expert affidavit is provided by ZF Active to demonstrate the opposite, that conditions were too hazardous for these systems to regain control.

Footnote 9:The difference between the sufficiency of federal safety records being potentially sufficient on GM's motion and insufficient for FCA and ZA Active is due to the fact that plaintiff's opposition does not raise a specific defect identified in her bill of particulars or the complaint that remained unaddressed in GM's moving papers.